United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 16, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-10791

OSCAR PRIVATE EQUITY INVESTMENTS, Individually and on behalf of
all others similarly situated,

Plaintiff-Appellee,

BRETT MESSING and MARLA MESSING,
Appellees,

versus

ALLEGIANCE TELECOM, INC., et al.,

Defendants,

ROYCE J. HOLLAND; ANTHONY NMI PARELLA,

Defendants–Appellants.

Appeal from the United States District Court
For the Northern District of Texas

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is a permissible interlocutory appeal from an order
certifying a securities-fraud class action. Plaintiffs allege
violations of section 10(b) and 20(a) of the Securities Exchange
Act of 1934 and Rule 10b-5 of the Securities Exchange Commission.

Relying on the fraud-on-the-market theory, the district court certified the class. We vacate the certification order and remand, persuaded that the class certified fails for wont of any showing that the market reacted to the corrective disclosure. Given the lethal force of certifying a class of purchasers of securities enabled by the fraud-on-the-market doctrine, we now in fairness insist that such a certification be supported by a showing of loss causation that targets the corrective disclosure appearing among other negative disclosures made at the same time.

I

The class included all investors who purchased the common stock of Allegiance Telecom between April 24, 2001 and February 19, 2002. Three investors bring this suit, Oscar Private Equity Investments, its managing partner, Brett Messing, and his wife, Marla Messing. They sue Royce Holland, former chairman and CEO of Allegiance, and Anthony Parella, former executive vice president for sales. Allegiance Telecom was named in the suit, but filed for bankruptcy and is not now a party.

Allegiance was a national telecommunications provider based in Dallas, Texas. It sold local telephone service, long distance, broadband access, web hosting, and telecom equipment with maintenance to small and medium sized businesses. Founded in 1997, by February 2002 it was providing service in thirty-six U.S. markets. At the beginning of the class period, April 24, 2001, there were over 112 million common shares of Allegiance stock

trading on the NASDAQ. Institutional investors held approximately 68 percent of Allegiance's stock and over fifty active market makers traded it.

Plaintiffs allege that Holland and Parella fraudulently misrepresented Allegiance's line-installation count in the company's first three quarterly announcements of 2001, and that Allegiance's stock dropped after Holland and Parella ultimately restated the count in the 4Q01 announcement. Defendants explain that the restatement occurred because Allegiance installed a new billing system in 2001 and reported line-count information from the new billing system instead of from the order management system which it replaced. Defendants further argue that the 4Q01 restatement did not cause the stock price to drop.

The relevant announcement history is as follows. Allegiance's stock, like that of the rest of the telecom industry, was plunging during what is now the class period, losing nearly 90% of its value during 2001. On April 24, 2001, the first day of the class period, Allegiance announced its 1Q01 results, including (1) 126,200 new lines installed; (2) revenues of $105.9 million, an 11% increase over 4Q00; (3) positive sales force growth; and (4) improved gross margin. The following trading day Allegiance's stock rose 9%, from $14.90 to $16.20, but soon declined again.

On July 24, 2001, Allegiance announced its 2Q01 results, including (1) 135,800 new lines installed; (2) revenues of $124.1 million; (3) an earnings loss of $0.92 per share, $0.03 better than

3

the analysts' consensus estimate; and (4) positive EBITDA[1] results in thirteen markets. The following trading day Allegiance's stock rose 20%, from $10.90 to $13.08 per share, but soon declined again.

On October 23, 2001, Allegiance announced its 3Q01 results, including (1) the installation of its one-millionth line; (2) revenues of $135 million; and (3) an earnings loss of $0.94 per share, $0.03 better than the analysts' consensus estimate. The next trading day Allegiance's stock rose 29%, from $5.21 to $6.74 per share, but remained volatile, falling to $3.70 per share by February 18, 2002, the day before the curative statements of the 4Q01 announcement.

On February 19, 2002, Allegiance announced its 4Q01 results, including (1) a restatement of the total installed-line count from 1,140,000 to 1,015,000, a difference of 125,000; (2) missed analysts' expectations on 4Q01 and 2001 earnings per share; (3) greater EBITDA loss than some analysts expected; and (4) a very thin margin of error for meeting revenue covenants for 2002. The next trading day Allegiance's stock continued its downward move, falling %28, from $3.70 to $2.65 per share. Less than 90 days later, Allegiance missed its covenants putting its credit lines in default and on May 14, 2003, filed for bankruptcy.

Six months after Allegiance's bankruptcy, plaintiffs filed this class action, alleging that Allegiance's officers

---

[1]EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization. It is a measure of profitability.

misrepresented the number of installed lines in their 1Q01, 2Q01, and 3Q01 announcements. Plaintiffs moved for class certification, relying on the fraud-on-the-market presumption for evidence of class-wide reliance. The district court certified the class,[2] and we granted interlocutory review.

## II

The class certification determination rests within the sound discretion of the trial court, exercised within the constraints of Rule 23.[3] A district court that premises its legal analysis on an erroneous understanding of the governing law has abused its discretion.[4]

## III

This dispute turns on whether the certification order properly relied upon the fraud-on-the-market theory. This theory permits a trial court to presume that each class member has satisfied the reliance element of their 10b-5 claim.[5] Without this presumption,

---

[2]The district court certified the following class: "All persons, without geographical limitation, who purchased Allegiance common stock in the open market during the period from April 24, 2001 through February 19, 2002, inclusive, and who were damaged by defendants' alleged violations of Section 10(b) and/or 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants, their legal representatives, heirs, successors and predecessors in interest, affiliates, assigns, and any entities in which the Defendants (or any of them) had a controlling interest in during the Class Period."

[3]*Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

[4]*Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 129 (5th Cir. 2005).

[5]The elements of a 10b-5 action include:
(1) a material misrepresentation (or omission);
(2) scienter, i.e., a wrongful state of mind;

questions of individual reliance would predominate, and the proposed class would fail.[6]

The Supreme Court in *Basic* adopted this presumption of reliance with respect to materially misleading statements or omissions concerning companies whose shares are traded in an efficient market.[7] Reliance is presumed if the plaintiffs can show that "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed."[8]

We have observed that *Basic* "allows each of the circuits room to develop its own fraud-on-the-market rules."[9]  This court has

---

(3) a connection with the purchase or sale of a security;
(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation,";
(5) economic loss; and
(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.  *Dura Pharms., Inc. v. Broudo*, 125 S. Ct. 1627 (2005).

[6]Fed.R.Civ.Pro. 23(b)(3).

[7]*In re LTV Securities Litigation*, 88 F.R.D. 134, 143 (N.D. Tex.1980); *Basic Inc. v. Levinson*, 485 U.S. 224, 244 (1988).

[8]*Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 661 (5th Cir. 2004).

[9]*Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1117-18 (5th Cir. 1988), *vacated on other grounds sub. nom. Fryar v. Abell*, 492 U.S. 914 (1989); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 414 (5th Cir. 2001).

used this room – in *Finkel*,[10] *Abell*,[11] *Nathenson*,[12] and *Greenberg*[13] – to tighten the requirements for plaintiffs seeking a presumption of reliance.    We now require more than proof of a material misstatement; we require proof that the misstatement *actually moved the market*.[14]  That is, "the plaintiff [may] recover under the fraud on the market theory if he [can] prove that the defendant's non-disclosure materially affected the market price of the security."[15]  Essentially, we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption.[16]  Our most recent statement of this rule was in *Greenberg*, which held that "to trigger the presumption [of reliance] plaintiffs must demonstrate that . . . the cause of the decline in price is due to the

_____

[10]*Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 364 (5th Cir.1987), *cert. denied*, 108 S.Ct. 1220 (1988).

[11]*Abell*, 858 F.2d at 1120-21 (stating in dicta that a plaintiff may recover under the fraud-on-the-market theory "if he could prove that the defendant's non-disclosures materially affected the market price of the security").

[12]*Nathenson*, 267 F.3d at 414 ("It is clear that a fraud-on-the-market theory may not be the basis for recovery in respect to an alleged misrepresentation which does not affect the market price of the security in question.").

[13]*Greenberg*, 364 F.3d at 662, 665–666.

[14]*Cf. In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir.1997). ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock.").

[15]*Nathenson*, 267 F.3d at 414 (*quoting Abell*, 858 F.2d 1104, 1120-21).

[16]Our approach is unaffected by the Supreme Court's recent and very narrow decision in *Dura Pharms.*, 125 S. Ct. at 1627.

7

revelation of the truth and not the release of the unrelated negative information."[17]

This requirement was not plucked from the air. *Basic* plainly states that the presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff."[18] This would include "a showing that the market price would not have been affected by the alleged misrepresentations, as in such a case the basis for finding that the fraud had been transmitted through the market price would be gone."[19]

Quoting this very language, plaintiffs argue that our requirement improperly shifts the burden, from a defendant's right of rebuttal to a plaintiff's burden of proof. We disagree. As a matter of practice, the oft-chosen defensive move is to make "*any showing that severs the link*" between the misrepresentation and the plaintiff's loss; to do so rebuts on arrival the plaintiff's fraud-on-the-market theory. In *Nathenson*, the link was severed by publicly available information that the misrepresentation didn't

---

[17]*Greenberg*, 364 F.3d at 665.

[18]485 U.S. at 245. The *Basic* Court continues, "*For example*, if [defendants] could show that the 'market makers" were privy to the truth about the merger discusses here with Combustion, and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken." *Id.* (emphasis added). Drawing on *Abell* and *Nathenson*, the *Greenberg* court added a showing to this list of "examples."

[19]*Nathenson*, 267 F.3d at 414.

8

move the stock price.[20]  In *Greenberg*, it was severed by publicly available evidence that the corrective disclosure was buried in other bad news.[21]  Hence, in cases like this one, we have required plaintiffs invoking the fraud on the market theory to demonstrate loss causation.[22]

The contours of this requirement — that the fraud affect the stock price — is the gist of this appeal.  It is a requirement complicated here by the fact that multiple items of positive information were released together with the alleged line-count inflation, and further complicated by the fact that multiple items of negative information were released together with the corrective disclosure.  In such multi-layered loss-causation inquiries, the legal standard, at least, is well established: *Greenberg* requires that plaintiffs prove "(1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is

---

[20]*Id.* at 414.

[21]*Greenberg*, 364 F.3d at 665.

[22]Our able brother frames our differences well, but is a bit enthusiastic in our holding.  We address here only the simultaneous disclosure of multiple negatives, not all of which are alleged culpable.  Indeed, applying the fraud-on-the-market theory to such complex circumstances by rote would yield a victory of habit over reason.  With multiple negatives, our usual approach to gauging efficiency and presuming reliance fails because we cannot know that the culpable information was priced, even if objectively material.  Proof that the culpable disclosure moved the market addresses this failure.  The dissent is troubled that we have not suggested what form such proof might take.  We have mentioned one form, event studies, for the sake of exposition only.  As we explain below, the plaintiff's own expert stated that such proof was well within her grasp.  Our further silence is an effort to leave open options, subject to scrutiny in the first instance by opposing experts and the district courts.

more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline."[23]

Neither party disputes *Greenberg*'s relevance. Instead, this appeal raises the question of whether we ought to apply Greenberg's loss-causation requirement at the class-certification stage, as well as the subsidiary question of the sufficiency of the evidence to establish the requirement. On the first question, defendants urge that the district court must consider all evidence, both for and against loss causation, at the class certification stage. On the second question, defendants argue that the district court abused its discretion in finding that plaintiffs made a showing sufficient to establish loss causation. We agree with both contentions.

A

First we address the question of whether loss causation – a fraud on the market prerequisite — should properly be addressed at the class certification stage. The district court ruled that "the class certification stage is not the proper time for defendants to rebut lead Plaintiffs' fraud-on-the-market presumption," and suggested that *Basic* "held that the presumption of reliance was rebuttable, but only as related to a summary judgment motion." Plaintiffs defend the court's ruling, noting that *Greenberg* was a

---

[23]*Greenberg*, 364 F.3d at 666.

summary-judgment case and urging that proof of loss causation at this stage "improperly combines the market efficiency standard with actual proof of loss causation."

There is widespread confusion on this point.  As we will explain, the confusion arises from an outdated view that fails to accord this signal event of the case its due.  Under this earlier view, class certification was to be made "as soon as practicable after the commencement of the action," mindful that the decision was tentative.  It could be tailored to facts emerging in discovery, and with subclasses built around awkward difficulties of showings that cut across only part of the class first certified. In short, class certification was a light step along the way, divorced from the merits of the claim.  Whatever reality this treatment was responsive to, it is not that of a class exceeding purchasers of millions of shares in a volatile and downward-turning market over a ten-month period, claiming injury from one of several simultaneous disclosures of negative information.

The power of the fraud-on-the-market doctrine is on display here.  With proof that these securities were being traded in an efficient market, the district court effectively concluded that if plaintiffs can establish at trial that defendants acted with the requisite intent in counting its installations then defendants would be liable for millions of dollars in paper losses on the day following the fourth-quarter filing date, less the amount the defendant may be able to persuade a jury was caused by other

11

circumstances — whether the purchaser held on and later sold at a higher price or rode the stock down to bankruptcy. In short, the efficient market doctrine facilitates an extraordinary aggregation of claims. We cannot ignore the *in terrorem* power of certification, continuing to abide the practice of withholding until "trial" a merit inquiry central to the certification decision, and failing to insist upon a greater showing of loss causation to sustain certification, at least in the instance of simultaneous disclosure of multiple pieces of negative news. Nor is there sound reason for an early "tentative" certification, which leaves loss causation for later more focused examination. It is not the need for discovery. Little discovery from defendants is demanded by the fraud-on-the-market regimen. Its "proof" is drawn from public data and public filings, as in this case. It is largely an empirical judgment that can be made then as well as later in the litigation.

These concerns have shaped the evolution of class certification and Rule 23. Rule 23(c)(1)(A) no longer demands that the district court rule on class certification "as soon as practicable,"[24] but instead insists only upon a ruling "at an early practicable time."[25] And although Rule 23 still recognizes that a

---

[24]Fed.R.Civ.P. 23(c)(1)(A)(2003).

[25]Fed.R.Civ.P. 23(c)(1)(A)(revised 2003).

class may be "altered or amended,"[26] it no longer characterizes the class certification order as "conditional,"[27] explaining, in the advisory committee notes, that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."[28] These subtle changes, as well as the less-subtle PSLRA, recognize that a district court's certification order often bestows upon plaintiffs extraordinary leverage, and its bite should dictate the process that precedes it. These changes are the product of years of study by the Advisory Committee on Civil Rules, including many open hearings and symposia. This collective wisdom must not be brushed aside. That there are "important due process concerns of both plaintiffs and defendants inherent in the certification decision," cannot be gainsaid.[29] Thus, in *Unger*, a similar 10b-5 case, we held that "[t]he plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification."[30] And we concluded that "[b]ecause Rule 23 mandates a complete analysis of fraud-on-the-market indicators, district courts must address and

---

[26]*Id.* at 23(c)(1)(C); *see id.* Advisory Committee Notes to the 2003 Amendments ("[I]t is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis.").

[27]This word has been demoted to the comments section.

[28]*See* Fed.R.Civ.P. 23 Advisory Committee Notes to the 2003 Amendments.

[29]*Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

[30]*Unger*, 401 F.3d at 321.

weigh factors both for and against market efficiency."[31]  This conclusion, that courts must examine factors both for and against, applies to the determination of all Rule 23's requirements.

Relatedly, Rule 23's requirements must be given their full weight *independent* of the merits.  District courts often tread too lightly on Rule 23 requirements that overlap with the 10b-5 merits, out of a mistaken belief that merits questions may never be addressed at the class certification stage.[32]  This is a misreading of *Eisen*, an early class-certification decision by the Supreme Court.[33]  The *Eisen* Court stated, "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."[34]  As Judge Jon Newman of the Second Circuit recently explained, "This statement has led some courts to think that in determining whether any Rule 23 requirement is met, a judge may not consider any aspect of the merits, and has led other courts to think that a judge may

---

[31]*Unger*, 401 F.3d at 325.

[32]*See, e.g., Barrie v. Intervoice-Brite*, 2006 WL 2792199, *10 (N.D.Tex.,2006)  ("Although *Basic* and *Greenberg* (the cases relied upon by Defendants) both held the presumption to be rebuttable at the summary judgment stage, such a finding by the court here, where the issue is class certification, would be premature, since the court cannot delve into the actual merits of Lead Plaintiffs' claims.").

[33]*Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311-41 (5th Cir. 2005).

[34]*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).

14

not do so at least with respect to a prerequisite of Rule 23 that overlaps with an aspect of the merits of the case."[35]

*Eisen* did not drain Rule 23 of all rigor. A district court still must give full and independent weight to each Rule 23 requirement, regardless of whether that requirement overlaps with the merits.[36] The statement in *Eisen* is troublesome only if read without the light of its facts. In *Eisen*, the district court's improper merits inquiry was *unrelated* to the Rule 23 requirements. And the same was true in our *Miller* decision, which was relied upon by *Eisen*, and which also held that a district court could not deny certification based on its view of the merits.[37] Both *Eisen* and *Miller* "stand for the unremarkable proposition that the strength of a plaintiff's claim should not affect the certification decision."[38] As the Second Circuit recently concluded, a district court must

> resolve[] factual disputes relevant to each Rule 23 requirement and find[] that whatever underlying facts are relevant to a particular Rule 23 requirement have been established . . . . [T]he obligation to make such determinations is not lessened by overlap between a Rule 23

---

[35]*Miles v. Merrill Lynch*, 471 F.3d 24, 27 (2d Cir. 2006).

[36]*See General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147. 160 (1982) (acknowledging that "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiffs' cause of action," and concluding that a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.").

[37]*Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971).

[38]*Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

15

requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.[39]

The answer to our first question, then, lies at the intersection of *Greenberg* and *Unger*. *Greenberg* holds that loss causation is a fraud-on-the-market prerequisite. *Unger* mandates "a complete analysis of fraud-on-the-market indicators" at the class certification stage, insisting that district courts "find" the facts favoring class certification. We hold hence that loss causation must be established at the class certification stage by a preponderance of all admissible evidence.[40]

Plaintiffs respond that the question of loss causation requires only a generalized inquiry into whether the misrepresentation moved the stock, an inquiry common to all members of the class. Pressing this point at oral argument, plaintiffs urged that it was inappropriate to address loss causation at the class-certification stage because loss causation necessarily predominates, unlike individualized questions of reliance.

We might agree, if loss causation were only empirical proof of materiality, unmoored from the question of classwide reliance. Yet we have explained that the refutation of loss causation "more

---

[39]*Miles*, 471 F.3d at 41.

[40]This is not to say that loss causation, as an element of a 10b-5 claim, cannot be reexamined at summary judgment.

16

appropriately relates to the element of reliance."[41]  This is because loss causation speaks to the semi-strong efficient market hypothesis on which classwide reliance depends, as we will explain.

The assumption that every material misrepresentation will move a stock in an efficient market is unfounded, at least as market efficiency is presently measured. There are two additional explanations, besides immateriality, for why a misrepresentation might fail to effect the stock price, both relevant to classwide reliance.  First, it might be that even though the market for the defendant's shares has been demonstrated efficient by the usual indicia,[42] the market is actually inefficient with respect to the particular type of information conveyed by the material misrepresentation, *i.e.* analysts and market makers do poorly at digesting line-count information.  Thus our approach gives effect to information-type inefficiencies, recognizing that "the market price of a security will not be uniformly efficient as to all types

---

[41]*Nathenson*, 267 F.3d at 415.  This relationship is foremost an artifact of the common law's influence on 10b-5 actions, yet it persists for good reason.  *See Schlick v. Penn Dixie*, 507 F.2d 374 (2d Cir. 1974); *Huddleston v. Herman & MacLean*, 640 F.2d 549 (5th Cir. 1981), *reversed in part Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983).

[42]These include "(1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrage[]rs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3; (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock." *Bell v. Ascendant Solutions, Inc.*,  422 F.3d 307, 313 (5th Cir. 2005).

of information."[43]    A second possible explanation for a misrepresentation's failure to move the market is that the market was strong-form efficient with respect to that type of information, *i.e.*, due to insider trading, the restated line count was reflected by the stock price well before the 4Q01 corrective disclosure. Both explanations resist application of the semi-strong efficient-market hypothesis, the theory on which the presumption of classwide reliance depends.  This court honors both theory and precedent in requiring plaintiffs to demonstrate loss causation before triggering the presumption of reliance.  The trial court erred in ruling that the class certification stage is not the proper time for defendants to rebut lead Plaintiffs' fraud-on-the-market presumption.

B

The legal error immediately identified, however, does not alone dictate vacatur in this case, as the trial court, out of caution perhaps, did not premise its analysis on its misunderstanding of the law.  Indeed, the trial court's memorandum opinion applies *Greenberg* and weighs all evidence, both for *and against* loss causation, in concluding that "it is more likely than not that a significant part of the stock decline causing the putative Class's loss is attributable to the line count corrective

---

[43]*See, e.g.*, Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan. L. Rev. 1059, 1083 (1990).

18

disclosure."   We vacate because this factual conclusion is untenable.  The plaintiff's expert report did not establish loss causation, and the district court abused its discretion in certifying the class.

As we explained above, when unrelated negative statements are announced contemporaneous of a corrective disclosure, the plaintiff must prove "that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline."[44]  We will not attempt to quantify what fraction of a decline is "significant." We note only that, under these circumstances, proof of a corrective disclosure's significant contribution to a price decline demands a peek at the plaintiff's damages model — an empirically-based inquiry, not speculation about materiality alone.  Yet plaintiffs' evidence on this point consists chiefly of analyst commentary.  For example, after the line-count restatement, James Ott at Hibernia Southcoast Capital cautioned,

> Unfortunately, Bears will have additional fodder during 1Q02, as [Allegiance] scrubbed their databases and found some differences in line count between billing and order management platforms . . . In light of 'Enron-itis,' we believe an increasingly skeptical market will have a negative view of this adjustment . . . Unfortunately, the line revision will cloud the company's otherwise strong performance.

And at BB&T Capital Markets, an analyst groused,

> The magnitude of this [line count] adjustment (12% of total) makes it difficult to swallow . . . Given the issues

---

[44]*Greenberg*, 364 F.3d at 666.

19

surrounding accounting today, the timing of such an adjustment could not be worse.

Plaintiffs cite several other such reports — one calls the line-count restatement "a yellow flag," and another suggests that "the Street is completely unwilling to listen to management explanations."

Defendants respond in kind, with more analyst quotes, including one from lead plaintiff Brett Messing, who reported in a May 15, 2002 column for RealMoney.com that "Allegiance's stocks and bonds are trading at distressed levels because of fears of a revenue covenant violation,[45] a more hostile regulatory environment, and customer churn." Notably Messing did not mention the line-count restatement and named Allegiance's management team "the industry's best." Similarly, Danny Zito at Lehman Brothers was concerned not with the line-count adjustment, which he opined was troubling only because it raised concerns with Allegiance's back office operations, but with Allegiance's "potential revenue covenant violation risk." Finally, James Ott at Hibernia, the same analyst quoted extensively by the plaintiffs, also reported that "[n]o material change ha[d] occurred fundamentally in ALGX's business," and explained that "the vast majority of the revisions were definitional rather than functional."

The plaintiffs have the better of this exchange, but nonetheless, their evidence is little more than well-informed

_____

[45]A prescient observation indeed.

speculation. To prove loss causation, and thereby trigger the presumption of reliance, plaintiffs must do better. The plaintiffs' expert does detail event studies supporting a finding that Allegiance's stock reacted to the *entire bundle* of negative information contained in the 4Q01 announcement, but this reaction suggests only market efficiency, not loss causation, for there is no evidence linking the *culpable* disclosure to the stock-price movement. When multiple negative items are announced contemporaneously, mere proximity between the announcement and the stock loss is insufficient to establish loss causation.

Plaintiff's expert, in her rebuttal, disagrees, but offers as evidence only the raw opinion of analysts, without supporting study of the market at issue — such as now common use of basic principles of econometrics. The expert's own concluding paragraph advised that her work was incomplete: "It is possible with further analyses to quantify the portion of the decline caused by the restated line count. However, Counsel has advised me that the quantification of damages is not appropriate at this stage of the litigation." So this is less of a dispute over what showing must be made, and more a dispute over when.

Something like the expert's "further analyses" is what is missing. While counsel is correct that *quantification* of damages is presently unnecessary – *i.e.* proof that some percentage of the drop was attributable to the corrective disclosure – the plaintiffs

21

must, in order to establish loss causation at this stage, offer some empirically-based showing that the corrective disclosure was more than just present at the scene.[46]   And this burden cannot be discharged by opinion bereft of the analysis plaintiff's own expert conceded was necessary, albeit in her counsel's view at a later stage.   The class certification decision bears due-process concerns for both plaintiffs and defendants,[47] and an empirical inquiry into loss causation better addresses these concerns than an impenetrable finding akin to a reasonable man assessment.   And analyst speculation about materiality, while better informed than a layman, more closely resembles the latter.   At least when multiple negative items are contemporaneously announced, we are unwilling to infer loss causation without more. In sum, only a medical doctor who has either conducted a post-mortem or reviewed the work of another who did so, may credibly opine about the cause of death.   We do not insist upon event studies to establish loss causation, helpful though they may be.   We hold only that the opinions of these analysts, without reference to any post-mortem data they have reviewed or conducted, is insufficient here.

Because plaintiffs have failed to trigger the presumption of reliance provided by the fraud-on-the-market theory, the class fails and we must vacate the order of certification.

---

[46]*Greenberg*, 364 F.3d at 666.

[47]*Unger*, 401 F.3d at 320–21.

22

We VACATE and REMAND for further proceedings consistent with this opinion.

DENNIS, CIRCUIT JUDGE, DISSENTING:

I respectfully dissent.

In this appeal from the district court's order granting class action certification, the majority departs drastically from the Supreme Court's decision in <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224 (1985), which held that securities class action plaintiffs are entitled to a rebuttable presumption of reliance, or transaction causation, if the plaintiffs traded in the stock at issue during the proposed class period in reliance on the integrity of the price set by an open and efficient market. The majority instead holds that plaintiffs are entitled to <u>Basic</u>'s presumption of reliance only if they also prove loss causation, that is, if they prove by a preponderance of all admissible evidence that the defendants' alleged misrepresentations were the proximate cause of the plaintiffs' economic loss. The majority's decision is, in effect, a breathtaking revision of securities class action procedure that eviscerates <u>Basic</u>'s fraud-on-the-market presumption, creates a split from other circuits by requiring mini-trials on the merits of cases at the class certification stage, and effectively overrules legitimately binding circuit precedents.

I also respectfully dissent from the majority's conclusion that the district court abused its discretion in certifying this class action. The majority found that the plaintiffs' evidence was insufficient to establish that the decline in Allegiance's share price was related to Allegiance's disclosure that it had overstated its line count figures, but the majority conducted what appears to have been a de novo, rather an abuse of discretion, review of the evidence in order to make that determination. In my opinion, the district court did not abuse its discretion in making the factual findings necessary to its certification of the case.

**I.**

The majority opinion relies heavily on this court's earlier decision in Greenberg v. Crossroads Systems, Inc., 364 F.3d 657 (5th Cir. 2004), which, the majority urges, establishes that "we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption." Supra at 8; see also supra at 16. As I discuss in greater detail below, Greenberg says no such thing. Neither Greenberg nor any other decision of this court holds that proof of loss causation is part of the fraud-on-the-market presumption. The majority's holding to the contrary amounts

25

to a profound modification of Greenberg.  See infra Part II.

Moreover, by its decision today the majority aggravates the already serious and unwarranted departure that Greenberg made from both Basic and prior circuit precedent.[1]  In Basic, the Supreme Court held that securities plaintiffs could satisfy the reliance element of a Section 10(b) claim through the fraud-on-the-market theory.  See Basic, 485 U.S. at 250.  The fraud-on-the-market theory essentially permits plaintiffs to establish the element of reliance by showing (1) that the market for the securities in question was efficient and (2) that they traded in reliance on the integrity of the market price for the securities.  See id. at 241-42 ("'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .  Misleading statements will therefore defraud purchasers of stock even if the

_____

[1]I have recently argued at length that Greenberg irreconcilably conflicts with both Basic and this court's prior fraud-on-the-market case law.  See Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., --- F.3d ----, 2007 WL 816518, at *22-24 (5th Cir. 2007)(Dennis, J., concurring in the judgment).

26

purchasers do not directly rely on the misstatements.'") (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)); id. at 247 ("[W]here materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed.").

The Basic court also held that the fraud-on-the-market presumption is rebuttable, but it made it plain that the defendant bears the burden of establishing that the presumption should not apply:

> [a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. For example, if [defendants] could show that the "market makers" were privy to the truth about the merger discussions here with Combustion, and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone.

Id. at 248 (emphasis added).

Up until our decision in Greenberg in 2004, this court consistently recognized Basic's holding that the defendant has the burden of rebutting the fraud-on-the-market presumption. See Nathenson v. Zonagen Inc., 267 F.3d 400, 413 (5th Cir. 2001); Fine v. Am. Solar King Corp., 919 F.2d 290, 299 (5th

27

Cir. 1990); see also Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 505 (S.D. Tex. 2004). Two years after Basic, this court held that there are three ways in which a defendant can rebut the presumption: by showing "(1) that the nondisclosures did not affect the market price, or (2) that the Plaintiffs would have purchased the stock at the same price had they known the information that was not disclosed; or (3) that the Plaintiffs actually knew the information that was not disclosed to the market." Fine, 919 F.2d at 299.

The Greenberg panel itself began by correctly describing Basic's presumption of reliance in favor of the plaintiff and recognizing that Basic places the burden of rebutting the presumption on the defendant.[2] See Greenberg, 364 F.3d at 661-62. Later in its opinion, however, the Greenberg panel erroneously concluded, contrary to both Basic and this court's prior decisions,[3] that securities plaintiffs cannot invoke the fraud-on-the-market presumption unless they first affirmatively

---

[2]Unlike this case, Greenberg did not involve a motion for class certification, but was instead an appeal from a grant of summary judgment. See Greenberg, 364 F.3d at 661.

[3]In Regents of the University of California, I explained why Greenberg is not a correct interpretation of this court's precedent. See --- F.3d at ----, 2007 WL 816518, at *23-24 (Dennis, J., concurring in the judgment).

28

show that the market price of the stock actually moved in response to either the defendants' alleged misrepresentation or a corrective disclosure.  See Greenberg, 364 F.3d at 663 (noting that plaintiffs must show "actual movement of [the] stock price" in order to trigger the fraud-on-the-market presumption).  Thus, instead of recognizing, in accord with Basic, that the plaintiffs were entitled to a presumption of reliance by virtue of simply trading in an efficient market, Greenberg placed on the plaintiffs the additional burden of showing that the misrepresentation or the corrective disclosure moved the market price.

The conflict between Basic and Greenberg is inescapable. Under Basic, the court is to presume that the defendant's material misstatement distorted the market price of the stock at issue.  See Basic, 485 U.S. at 247 ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."); Nathenson, 267 F.3d at 415 ("[T]here is generally a presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market . . . .").  Greenberg, however,

29

subverts the fraud-on-the-market presumption by requiring the plaintiffs to prove, as a precondition to the application of the presumption, the very facts that are to be presumed under Basic (i.e., that the defendant's material misrepresentation was reflected in the stock price). As a result, Greenberg effectively relieves the defendant of its burden under Basic to rebut the fraud-on-the-market presumption. See Regents of the Univ. of Cal., --- F.3d ----, 2007 WL 816518, at *23-24 (Dennis, J., concurring in the judgment).

Confronted with the argument that Greenberg improperly shifts the Basic burden, changing it from a defendant's right of rebuttal to a plaintiff's burden of proof, the majority makes a meager effort to claim that both Greenberg and today's decision are somehow compatible with Basic's command that it falls to the defendant to rebut the presumption of reliance. The majority attempts to recharacterize the Basic presumption as a sort of "bursting bubble" presumption, e.g., one that "disappears if anything to the contrary is placed before the court." United States v. Zavala, 443 F.3d 1165, 1169 (9th Cir. 2006); cf. Black's Law Dictionary 211 (8th ed. 2004) (defining the "bursting bubble theory" as "[t]he principle that a presumption disappears once the presumed facts have been

30

contradicted by credible evidence"). The majority posits that "[a]s a matter of practice, the oft-chosen defensive move is to make '_any_ showing that severs the link' between the misrepresentation and the plaintiff's loss; to do so rebuts on arrival the plaintiff's fraud-on-the-market theory." _Supra_ at 9. Although the majority conspicuously neglects to explain what type of evidence a defendant would have to produce to meet its standard, the clear implication is that, in the majority's view, the _Basic_ presumption evaporates as soon as a defendant simply introduces a mere possibility the defendant's material misrepresentation might not have affected the market price.

The majority cannot outflank _Basic_ so easily, however. As noted above, _Basic_ expressly states that the defendants can rebut the presumption only if they "could _show_ . . . that the market price _would not have been affected_ by their misrepresentations." _Basic_, 485 U.S. at 248 (emphasis added). _Basic_ thus clearly places the burdens of both producing evidence and persuasion on the defendant and requires an actual showing that the defendant's misrepresentation did not, or could not have, affected the market price of the stock. _Id._; _Fine_, 919 F.2d at 299 ("The presumption of reliance can be rebutted by showing . . . that the nondisclosures did not

31

affect the market price . . . ."); see also Abell v. Potomac Ins. Co., 858 F.2d 1104, 1120 (5th Cir. 1988) (stating that Basic "shift[s] the burden of persuasion, as to reliance, onto securities fraud defendants"), vacated on other grounds sub nom., Fryar v. Abell, 492 U.S. 914 (1989).  Under no reasonable reading can that standard be met, as the majority suggests, by simply asserting that a particular change in the market price could have been related to something other than the defendant's misrepresentations.

For the reasons stated above, I continue to believe that Greenberg conflicts with binding precedents of both the Supreme Court and this court, and I do not therefore regard that case as binding or persuasive on the point at issue.  See Modica v. Taylor, 465 F.3d 174, 183 (5th Cir. 2006) ("'When panel opinions appear to conflict, we are bound to follow the earlier opinion.'") (quoting H&D Tire & Auto.-Hardware, Inc. v. Pitney Bowes Inc., 227 F.3d 326, 330 (5th Cir. 2001)).  Consequently, the majority was not bound to repeat the Greenberg panel's error. Instead, it should have adhered to Basic and this court's pre-Greenberg jurisprudence, rather than repeating and — as I discuss next — exacerbating Greenberg's flaws.

**II.**

32

Even setting aside the preceding discussion of Greenberg's conflict with Basic, Greenberg simply does not stand for the principle the majority purports to draw from it, i.e., that "we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption." Supra at 8.

In Greenberg, the court stated that in order to merit a presumption of reliance under the fraud-on-the-market theory,

> [a] causal relationship between the statement and actual movement of the stock price is still required. . . . It is this actual movement of stock price which must be shown by fraud-on-the-market plaintiffs . . . .

Greenberg, 364 F.3d at 663.[4] The Greenberg panel later explained how plaintiffs could satisfy this requirement of showing actual price movement:

> the main concern when determining whether a plaintiff is entitled to the presumption of reliance is the causal connection between the allegedly false statement and its effect on a company's stock price.

---

[4]Greenberg purported to find that requirement in this court's earlier decision in Nathenson, which, on a motion to dismiss, held that "where the facts properly considered by the district court reflect that the information in question did not affect the price of the stock then the district court may properly deny fraud-on-the-market based recovery." Nathenson, 267 F.3d at 415. As I explained in Regents of the University of California, Nathenson does not actually support the Greenberg panel's decision to give plaintiffs the affirmative burden of showing that the misrepresentation moved the market price. See --- F.3d at ----, 2007 WL 816518, at *24 (Dennis, J., concurring in the judgment).

33

> Nathenson makes it clear that to establish this nexus the plaintiffs must be able to show that the stock price was actually affected. This is ordinarily shown by an increase in stock price immediately following the release of positive information. We read Nathenson to also allow plaintiffs to make this showing by reference to actual negative movement in stock price following the release of the alleged "truth" of the earlier misrepresentation.

Greenberg, 364 F.3d at 665. Assuming for the sake of argument that Greenberg is correct, then, a plaintiff could satisfy Greenberg in the typical securities fraud case involving allegations that the defendant's misrepresentations artificially inflated the issuer's stock price by showing that the market price of the stock moved either upward at the time of the defendant's alleged misrepresentation or downward at the time that the truth was disclosed.

The majority, however, disregards the part of Greenberg that states that the actual price movement component of its version of the fraud-on-the-market theory can be satisfied by showing an increase in the stock price on the heels of the misrepresentation. Instead, the majority erroneously reads Greenberg to require the plaintiffs to establish the conceptually distinct element of loss causation, i.e., proximate cause of economic loss, by showing that the stock price declined in response to a corrective disclosure, to

34

trigger the fraud-on-the-market presumption.  The majority's rule finds no support in <u>Greenberg</u>.  This new rule directly conflicts with the above-quoted language from <u>Greenberg</u>, and nothing in <u>Greenberg</u> so much as suggests that the showing it requires as a condition to a presumption of <u>reliance</u> somehow includes proof of the distinct element of <u>loss causation</u>.

Accordingly, because the rule that the majority purports to derive from <u>Greenberg</u> has no basis in that case, I could not join the majority's opinion even were I not convinced that <u>Greenberg</u> conflicts with <u>Basic</u> and this circuit's precedent.[5]

**III.**

Whatever the merits of the majority's belief that private securities class action procedure is in need of drastic change and revision, today's judicially-enacted reform is, in my opinion, ill-advised and cannot be justified under current law.

Under the majority's approach, <u>Basic</u>'s fraud on the market presumption is essentially a dead letter, little more than a quaint reminder of earlier times, and its primary holding is

---

[5]Incidentally, it is undisputed, as the majority acknowledges, that Allegiance's share price increased substantially immediately after each of defendants' allegedly false statements about the company's line count. <u>See</u> <u>supra</u> at 3-4. The majority fails utterly to explain why that price movement is insufficient to trigger the fraud-on-the-market presumption under <u>Greenberg</u>.

35

supplanted by extensions of the policy considerations that the majority sees reflected in the enactment of the PSLRA and in recent amendments to Rule 23 (neither of which actually purports to alter Basic or to speak directly to the issue in this case). Such policy considerations, however, no matter how sincerely interpreted or applied, do not give this court the authority to overrule the Supreme Court's decisions or to change the recognized elements of a Section 10(b) claim, both of which the majority effectively does today. See Unger v. Amedisys, 401 F.3d 316, 322 n.4 (5th Cir. 2005) ("[I]t is the Supreme Court's job to overrule Basic, in the absence of outright conflict with the Private Securities Litigation Reform Act.")

The majority states that its "approach is unaffected by the Supreme Court's recent and very narrow decision in Dura Pharms.[, Inc. v. Broudo, 125 S. Ct. 1627 (2005)]." See supra at 8 n.16. Although Dura was indeed a narrow decision, it nevertheless undercuts the majority's position in several respects. The Dura court reaffirmed Basic, repeatedly citing it with approval, and it expressly recognized that reliance and loss causation are separate and distinct elements of the

36

Section 10(b) cause of action,[6] and that <u>Basic</u>'s fraud-on-the-market presumption relates only to the former.  <u>See</u> <u>Dura</u>, 544 U.S. at 341-42.[7]

The majority's approach simply disregards this distinction and takes the novel step of making proof of loss causation a prerequisite to the establishment of reliance through the fraud-on-the-market presumption for purposes of certification. As neither <u>Basic</u> nor any authority supports the majority's

---

[6]<u>See</u> <u>Dura</u>, 544 U.S. at 341-42 ("In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include . . . . (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' <u>see</u> <u>Basic</u>, <u>supra</u>, at 248-249, 108 S.Ct. 978 (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence); . . . . and (6) '<u>loss causation</u>,' <u>i.e.</u>, a causal connection between the misrepresentation and the loss.").

[7]Moreover, I further disagree with the majority to the extent that its opinion can be read to suggest that loss causation can be established <u>only</u> by showing a drop in the market price of the security in response to an explicit corrective disclosure.  Although this will frequently be the method through which plaintiffs attempt to prove loss causation, the <u>Dura</u> court specifically refrained from setting rigid requirements as to how plaintiffs might prove loss causation.  <u>See</u> <u>Dura</u>, 544 U.S. at 346 ("[W]e find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.  We need not, and do not, consider other proximate cause or loss-related questions.").

37

decision to conflate these two elements, I cannot subscribe to the majority's unwarranted realignment of securities class action procedure.

## IV.

Because, as the above sections demonstrate, plaintiffs are not required to prove loss causation as part of the fraud-on-the-market presumption (and because defendants make no other plausible arguments for why plaintiffs should be required to prove loss causation at the class certification stage), the majority's decision dramatically expands the scope of class certification review in this circuit to effectively require a mini-trial on the merits of plaintiffs' claims at the certification stage. In so doing, the decision contradicts both this circuit's Rule 23 case law and the decisions of other circuits concerning the scope of the class certification inquiry.

Before certifying a class action, the district court must ensure that the proposed class satisfies all of the requirements of Rule 23. See, e.g., Unger, 401 F.3d at 320 ("[T]he Supreme Court requires district courts to conduct a rigorous analysis of Rule 23 prerequisites."). We must be ever mindful, however, that class certification hearings "should not

38

be mini-trials on the merits of the class or individual claims." Id. at 321 (citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974)). A court must conduct an "intense factual investigation," Robinson v. Texas Automobile Dealers Association, 387 F.3d 416, 420 (5th Cir. 2004), yes, and in doing so the district court must often go "beyond the pleadings" and "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996). The district court cannot, however, go beyond those issues necessary to decide whether the requirements of Rule 23 are satisfied and rule on merits issues that are unrelated to Rule 23. See In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006) ("[A] district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement.") (emphasis added); see also Szabo v. Bridgeport Mach., Inc., 249 F.3d 672, 677 (7th Cir. 2001) ("A court may not say something like 'let's resolve the merits first and worry about the class later' . . . or 'I'm not going to certify a class unless I think that the plaintiffs will prevail.'").

Like the district court, we must restrict our review of the merits to encompass only those issues necessary to determining whether the proposed class satisfies the requirements of Rule 23.  See Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 314 (5th Cir. 2005) (stating that Rule 23(f) permits a party to "'appeal only the issue of class certification; no other issues may be raised'") (quoting Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 294 (5th Cir. 2001)).

Proof of loss causation is not related to the Rule 23 inquiry through the fraud-on-the-market presumption, and it will not, in the ordinary case, be otherwise relevant to the district court's Rule 23 inquiry.[8]  The majority's decision to require proof of loss causation at class certification in securities class actions therefore represents a drastic departure from this circuit's settled limitations, laid out in Unger and Bell, on the scope of the class certification

---

[8]Even in cases where the defendant asserts that loss causation is an individual issue, peculiar to each plaintiff, that defeats the Rule 23 requirements of commonality or predominance, the district court need not require plaintiffs to actually prove loss causation at the class certification stage.  Rather, the district court must only find either that all of the plaintiffs can prove loss causation in the same way or that any individual issues do not defeat commonality or predominance.

inquiry.  Furthermore, it creates a conflict with the decisions of other circuits.  <u>See, e.g.</u>, <u>Initial Pub. Offering</u>, 471 F.3d at 41-42; <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 366 (4th Cir. 2004); <u>Szabo</u>, 249 F.3d at 677.  The majority's consideration of merits issues unrelated to the requirements of Rule 23 breaches <u>Eisen</u>'s longstanding admonition against turning class certification into a mini-trial on the merits, and I cannot follow the majority down that path.

## CONCLUSION

In my opinion, the new rule applied by the majority is an unjustified revision of securities class action procedure, based in large part upon the majority's dramatic remolding of this court's already problematic decision in <u>Greenberg</u>.  In essence, the majority's revised standard both incorrectly deprives plaintiffs of the benefit of the fraud-on-the-market presumption of reliance afforded them by <u>Basic</u> and inexplicably requires them to prove the separate element of loss causation at the class certification stage.

Regardless, however, the majority does not, and cannot, show that the district court abused its discretion in certifying the class in this case, even under the majority's novel rules.  The district court carefully considered the

41

evidence before it and concluded that the plaintiffs had established that it was more likely than not that Allegiance's restatement of its line-count numbers caused a significant portion of the subsequent decline in Allegiance's share price. The majority nevertheless finds the district court's decision "untenable," and reverses simply because it is not in keeping with the majority's <u>de novo</u> assessment of the conflicting evidence.

Because I disagree with both the substance of the majority's new rule and the legal reasoning by which it was derived, and because I can discern no abuse of discretion in the district court's decision, I respectfully dissent.